No. 26-20166

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

In the Matter of The Container Store Group, Incorporated; The Container Store, Incorporated; C Studio Manufacturing, Incorporated; C Studio Manufacturing, L.L.C.; TCS Gift Card Services, L.L.C.,

Debtors,

Kevin M. Epstein, United States Trustee for Region 7,

Appellant/Cross-Appellee,

v.

The Container Store Group, Incorporated; The Container Store, Incorporated; C Studio Manufacturing, Incorporated; C Studio Manufacturing, L.L.C.; TCS Gift Card Services, L.L.C.,

Appellees/Cross-Appellants.

On Appeal from the United States District Court
for the Southern District of Texas
4:25-cv-00618

## BRIEF FOR APPELLANT KEVIN M. EPSTEIN, UNITED STATES TRUSTEE FOR REGION 7

*Of Counsel:*

LISA A. TRACY
   *Deputy General Counsel*
BETH A. LEVENE
   *Associate General Counsel*
FREDERICK GASTON HALL
SUMI K. SAKATA
   *Trial Attorneys*
   *Executive Office for U.S. Trustees*
   *U.S. Department of Justice*

BRETT A. SHUMATE
   *Assistant Attorney General*

MICHAEL S. RAAB
STEVEN H. HAZEL
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7217*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2498*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as appellant is a governmental party.  5th Cir. R. 28.2.1.

# STATEMENT REGARDING ORAL ARGUMENT

This case involves an important question of bankruptcy law that is a matter of first impression in this Circuit. The government respectfully submits that oral argument is therefore appropriate.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ............................................................. 2

STATEMENT OF THE ISSUE ................................................................... 3

STATEMENT OF THE CASE ..................................................................... 3

    A.    Statutory Background ........................................................... 3

    B.    Factual Background And Prior Proceedings ........................ 6

SUMMARY OF ARGUMENT .................................................................. 11

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ........................................................................................... 13

I.    This Court Has Appellate Jurisdiction .......................................... 13

II.    The Disputed Third-Party Release Is Nonconsensual And Thus Unlawful ....................................................................................... 15

    A.    The Release Deems Silence As Consent In Violation of Foundational Contract-Law Principles ................................ 15

    B.    The District Court Erred In Applying A Test Unmoored From Contract Principles ........................................................ 19

CONCLUSION ........................................................................................ 31

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*American Prairie Constr. Co. v. Hoich,*
594 F.3d 1015 (8th Cir. 2010) ............................................................... 27

*Atherton v. FDIC,*
519 U.S. 213 (1997) ............................................................... 28

*Barton v. Barbour,*
104 U.S. 126 (1881) ............................................................... 14

*Browning v. Navarro,*
743 F.2d 1069 (5th Cir. 1984) ............................................................... 23

*Bullard v. Blue Hills Bank,*
575 U.S. 496 (2015) ............................................................... 2

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ............................................................... 30

*Commonwealth Oil Refin. Co., Inc., In re,*
805 F.2d 1175 (5th Cir. 1986) ............................................................... 30

*Community Home Fin. Servs. Corp., In re,*
32 F.4th 472 (5th Cir. 2022) ............................................................... 13

*Continental Airlines Corp., In re,*
907 F.2d 1500 (5th Cir. 1990) ............................................................... 16

*Cortez, In re,*
457 F.3d 448 (5th Cir. 2006) ............................................................... 14

*Craig's Stores of Texas, Inc., In re,*
266 F.3d 388 (5th Cir. 2001) ............................................................... 30

*Deepwater Horizon, In re,*
786 F.3d 344 (5th Cir. 2015) ............................................................... 18, 27

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ............................................................... 30

*Golden Pac. Bancorp v. FDIC,*
   273 F.3d 509 (2d Cir. 2001) ................................................. 1, 11, 16

*Hanover Nat'l Bank v. Moyses,*
   186 U.S. 181 (1902) ................................................................ 28

*Harrington v. Purdue Pharma L.P.,*
   603 U.S. 204 (2024) ....................................... 1, 3, 4, 5, 8, 15, 16, 21, 22, 23

*Harrington v. Purdue Pharma L.P.,*
   No. 23A87 (U.S. Aug. 7, 2023) ................................................... 24

*Highland Cap. Mgmt., L.P., In re,*
   132 F.4th 353 (5th Cir. 2025) .............................................. 11, 14

*Houston v. Holder,*
   60 F.3d 230 (5th Cir. 1995) .................................................. 27, 29

*Lawyer v. Department of Just.,*
   521 U.S. 567 .................................................................... 17

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,*
   478 U.S. 501 (1986) ............................................................. 16

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ............................................................. 31

*Nexpoint Advisers, L.P. v. Highland Cap. Mgmt. L.P.,*
   48 F.4th 419 (5th Cir. 2022) ................................................... 14

*O'Melveny & Myers v. FDIC,*
   512 U.S. 79 (1994) .............................................................. 28

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985) ......................................................... 10, 20

*Prescription Home Health Care, Inc., In re,*
   316 F.3d 542 (5th Cir. 2002) ................................................... 22

*Purdue Pharma L.P., In re,*
   No. 19-23649 (S.D.N.Y. Bankr. June 20, 2025) .................................. 24

*Purdue Pharma L.P., In re*,
 No. 21-cv-7532 (S.D.N.Y. Nov. 15, 2021) ...................................... 23

*Railroad Mgmt. Co. v. CFS Louisiana Midstream Co.*,
 428 F.3d 214 (5th Cir. 2005) ........................................ 18, 27, 28

*Railway Lab. Execs.' Ass'n v. Gibbons*,
 455 U.S. 457 (1982) .............................................................. 15

*Raleigh v. Illinois Dep't of Revenue*,
 530 U.S. 15 (2000) ................................................................ 27

*Rodriguez v. FDIC*,
 589 U.S. 132 (2020) .............................................................. 29

*Smith v. Bayer Corp.*,
 564 U.S. 299 (2011) .............................................................. 21

*Sturges v. Crowninshield*,
 17 U.S. (4 Wheat.) 122, 176 (1819) ....................................... 4

*Taylor v. Sturgell*,
 553 U.S. 880 (2008) .............................................................. 17

*Tennessee Student Assistance Corp. v. Hood*,
 541 U.S. 440 (2004) ............................................................... 4

*Texas Commercial Energy, In re*,
 607 F.3d 153 (5th Cir. 2010) ................................................. 22

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*,
 549 U.S. 443 (2007) .............................................................. 27

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) .............................................................. 21

*United States v. Energy Resources Co.*,
 495 U.S. 545 (1990) .............................................................. 22

*United States v. Sanchez-Gomez*,
 584 U.S. 381 (2018) .............................................................. 21

*Vanderbilt Mortg. & Fin., Inc. v. Flores*,
   692 F.3d 358 (5th Cir. 2012) ................................................... 16

*Wright v. Union Cent. Life Ins. Co.*,
   304 U.S. 502 (1938) ........................................................ 3, 15

*Yazoo Pipeline Co., L.P., In re*,
   746 F.3d 211 (5th Cir. 2014) ......................................... 13, 14, 15

*Zarnel, In re*,
   619 F.3d 156 (2d Cir. 2010) ................................................. 5

**U.S. Constitution:**

Art. I, § 8, cl. 4 ............................................................... 15

**Statutes:**

Bankruptcy Act of 1800, ch. 19, 2 Stat. 19 ................................... 5

11 U.S.C. § 307 ............................................................... 5

11 U.S.C. § 524(e) ............................................................ 5

11 U.S.C. § 524(g)(4)(A)(ii) .................................................. 5

11 U.S.C. § 541(a) ............................................................ 3

11 U.S.C. § 542(g)(4)(A)(ii) ................................................. 15

11 U.S.C. § 1109(a) ........................................................... 9

11 U.S.C. § 1122 ............................................................. 3

11 U.S.C. § 1125(b) .......................................................... 4

11 U.S.C. § 1123(b)(6) ....................................................... 16

11 U.S.C. § 1126(a) .......................................................... 3

11 U.S.C. § 1126(c)-(d) ...................................................... 4

11 U.S.C. § 1126(f) ........................................................ 3, 6

11 U.S.C. § 1129 ...................................................................................... 3

11 U.S.C. § 1129(a)(8) .......................................................................... 3

11 U.S.C. § 1141 ..................................................................................... 3

11 U.S.C. § 1141(a) ............................................................................... 4

11 U.S.C. § 1141(d)(1)(A) ................................................................... 4

11 U.S.C. § 1142(b) ............................................................................... 30

28 U.S.C. § 158(a)(1) ............................................................................ 2

28 U.S.C. § 158(d) ................................................................................ 13

28 U.S.C. § 158(d)(1) ........................................................................... 2

28 U.S.C. §§ 581-589a .......................................................................... 5

28 U.S.C. § 586(a)(3)(B) ...................................................................... 5

28 U.S.C. § 1334(a) .............................................................................. 2

**Rules:**

Fed. R. Bankr. P. 7023 ......................................................................... 21

Fed. R. Civ. P. 23(a)-(e) ....................................................................... 21

Fed. R. Civ. P. 23(a)(3) ........................................................................ 21

Fed. R. Civ. P. 23(a)(4) ........................................................................ 21

Fed. R. Civ. P. 23(g) ............................................................................ 21

**Legislative Materials:**

H.R. Rep. No 95-595 (1977) ............................................................... 30

**Other Authorities:**

1 Arthur L. Corbin, *Corbin on Contracts* (2025)
§ 3.18 ........................................................................................................ 17
§ 3.19 ................................................................................................... 19, 25

Restatement (Second) of Contracts (A.L.I. 1981)
§ 69 ................................................................................................ 17, 18, 26
§ 284 ....................................................................................................... 17

2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* (4th ed.)
§ 6:67 ....................................................................................................... 1
§ 6:67 ................................................................................................... 25, 26

**INTRODUCTION**

In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not authorize courts to extinguish a nondebtor's claim against another nondebtor without the claimant's consent. The Court explained that these provisions, known as nonconsensual third-party releases, are at odds with the Code's text, structure, and history.

This case arises from a bankruptcy plan containing a third-party release that "forever and unconditionally" releases a wide range of claims belonging to thousands of nondebtors against thousands of other nondebtors. ROA.180-81. Although the plan allows claimants to opt out of the release, it provides that any claimant who does not affirmatively opt out shall be deemed to have consented to the release.

This release is nonconsensual and therefore unlawful under *Purdue*. "A release is a species of contract and is governed by principles of contract law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001) (quotation marks omitted). And it is a rule "almost universally" acknowledged in contract law that, absent exceptional circumstances, "silence will not amount to acceptance." 2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 6:67 (4th ed.), Westlaw (database updated May 2026). The release violates that axiom by permanently extinguishing claims belonging to more than 16,000 claimants who remained silent instead of opting out.

In overruling the U.S. Trustee's objection to the third-party release and a related injunction, the bankruptcy court and district court disregarded longstanding contract principles. The bankruptcy court inverted those principles, appearing to regard silence as generally sufficient for acceptance. And the district court fashioned a new, 12-factor federal test for consent that has no basis in the Bankruptcy Code. This Court should hold that contract principles control, reverse the bankruptcy and district court's decisions, and remand for the bankruptcy court to strike the third-party release and related injunction provisions from the plan. At an absolute minimum, the case should be remanded for the bankruptcy court to apply contract-law principles.

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction over debtors' bankruptcy under 28 U.S.C. § 1334(a). The bankruptcy court confirmed debtors' reorganization plan on January 24, 2025. ROA.12. The district court had jurisdiction over the U.S. Trustee's appeal of the bankruptcy court's order under 28 U.S.C. § 158(a)(1), which grants district courts appellate jurisdiction over final orders in bankruptcy cases. A confirmation order is a final order. *See Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015). The district court entered an order "affirm[ing] in large part and revers[ing] in limited part" the confirmation order on February 12, 2026. ROA.9459. As discussed below, *see infra* pp. 13-15, the district court's order qualifies as a final order subject to this Court's jurisdiction under 28 U.S.C. § 158(d)(1).

2

# STATEMENT OF THE ISSUE

Whether the district court erred in approving the disputed third-party release and a related injunction.

# STATEMENT OF THE CASE

## A. Statutory Background

Bankruptcy is the "subject of the relations between a[] . . . debtor and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks omitted). The Bankruptcy Code is a comprehensive scheme that establishes a highly reticulated mechanism for the equitable adjustment of the debtor-creditor relationship. "When a debtor files for bankruptcy, it 'creates an estate' that includes virtually all the debtor's assets." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 214 (2024) (quoting 11 U.S.C. § 541(a)). Chapter 11 of the Code allows "the debtor [to] work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval." *Id.* A plan cannot be confirmed unless it satisfies certain statutory prerequisites. 11 U.S.C. §§ 1129, 1141.

One prerequisite to plan confirmation is obtaining the approval of each impaired class of claims or interests. 11 U.S.C. § 1129(a)(8); *see id.* § 1122 (providing for the division of a debtor's creditors into classes based on their claims' nature and priority). Only creditors whose claims are impaired by a plan are entitled to vote on it. *Id.* § 1126(a), (f). To inform that decision, the Bankruptcy Code requires a plan's

3

proponents to send creditors a disclosure statement containing "adequate information" about the plan. *Id.* § 1125(b). A class accepts a plan if class members "hold[ing] at least two-thirds in amount and more than one-half in number of the allowed claims" or "interests" have voted to accept it. *Id.* § 1126(c)-(d).

Once the bankruptcy court has confirmed a plan, "that document binds the debtor and its creditors going forward—even those who did not assent to the plan." *Purdue*, 603 U.S. at 214 (citing 11 U.S.C. § 1141(a)). The effect of confirmation is to "'discharge[] the debtor from any debt that arose before the date of such confirmation,' except as provided in the plan, the confirmation order, or the code." *Id.* (quoting 11 U.S.C. § 1141(d)(1)(A)). This "discharge not only releases or 'void[s] any past or future judgments on the' discharged debt; it also 'operat[es] as an injunction . . . prohibit[ing] creditors from attempting to collect or to recover the debt.'" *Id.* at 215 (alterations in original) (quoting *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004)).

"Every bankruptcy law" of which we are aware, "from 1800 until 1978," has "generally reserved the benefits of discharge to the debtor who offered a 'fair and full surrender of [its] property.'" *Purdue*, 603 U.S. at 223-24 (alteration in original) (quoting *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 176 (1819)). None of the current Bankruptcy Code's hundreds of provisions expressly authorizes, as a general matter, bankruptcy courts to discharge claims belonging to nondebtors against other nondebtors. To the contrary, the Code specifies that a discharge of a debt "does not

4

affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

Since Congress enacted the Nation's first bankruptcy law over two centuries ago, *see* Bankruptcy Act of 1800, ch. 19, 2 Stat. 19, Congress has departed from this longstanding practice just once. In § 524(g) of the Code, which applies exclusively to bankruptcies involving asbestos, Congress authorized courts to extinguish a limited category of nondebtors' claims against other nondebtors without consent. 11 U.S.C. § 524(g)(4)(A)(ii). Accordingly, the Supreme Court recently held that the Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Purdue*, 603 U.S. at 227.

Congress has authorized the Attorney General to appoint U.S. Trustees, who are Department of Justice officials, to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581-589a. U.S. Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). They "may raise and may appear and be heard on any issue in any case or proceeding" brought under the Bankruptcy Code. 11 U.S.C. § 307; *accord In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) (holding that U.S. Trustees have standing to pursue bankruptcy appeals because of their "responsibility to represent and protect the public interest"). Congress specifically empowered U.S. Trustees to comment on Chapter 11 reorganization plans. 28 U.S.C. § 586(a)(3)(B).

### B. Factual Background And Prior Proceedings

**1.** Debtors are The Container Store Group, Inc. and its affiliates. ROA.9408. Following negotiations with certain creditors, debtors filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of Texas. ROA.9408. The next day, debtors filed a plan, which the bankruptcy court confirmed about a month later. ROA.302, 322. Under the plan, some creditors received full compensation and were thus not entitled to vote on the plan, *see* 11 U.S.C. § 1126(f); public shareholders received nothing and were thus deemed to reject the plan, *see id.* § 1126(g); and a small group of creditors received partial payment and were thus entitled to vote. *See* ROA.174-75. Although the plan disposed of claims held by thousands of creditors and shareholders, only 84 ballots were cast on the plan. *See* ROA.21.

The confirmed plan includes a third-party release that "forever and unconditionally" extinguishes the claims of thousands of nondebtors against other nondebtors. ROA.180-81. The release is broad enough to cover everything from a personal-injury claim for an injury sustained at a store against an employee, to a claim related to the sale of securities by debtors or their affiliates, to a harassment suit against an employee. The plan accomplishes this by terminating "any and all Claims" (except for "actual fraud, gross negligence, or willful misconduct" as well as certain commercial claims) to the extent that the claims "relate to" or "in any manner aris[e] from" ten broad categories of activity, including "the management, ownership, or operation" of debtors and certain affiliates, "the business or contractual arrangements

6

between any Debtor or Non-Debtor Affiliate and any other Entity," "the purchase, sale, or rescission of any Security" of debtors or certain affiliates, debtors' "in- or out-of-court restructuring efforts," and "any other act, or omission, transaction, agreement, event, or other occurrence relating to any of the foregoing and taking place on or before the Effective Date." ROA.180-81.

Among the thousands of nondebtor entities whose claims are extinguished by the third-party release are "each Holder of a Claim or Interest in a Class (other than Holders of Rejection Damages Claims) that does not affirmatively elect to opt out." ROA.102. The beneficiaries of the release generally include, among others, (1) debtors, reorganized debtors, and their affiliates, (2) those entities' current and former directors and officers, (3) various entities involved in the reorganization process, (4) "each Releasing Party," and (5) each "Related Party" of all those entities. ROA.102. Most of the released parties are not debtors in the bankruptcy.

In addition to the third-party release, the plan also includes an injunction and a gatekeeping provision. The injunction prohibits bringing a released claim. ROA.182. And the gatekeeping provision establishes that "No Person or Entity" may bring a claim against debtors or certain other entities "that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of" any released claim unless the bankruptcy court first determines that the claim is "colorable" and "specifically authoriz[es]" that it be brought. ROA.183.

Rather than obtain affirmative consent for the third-party release, debtors proposed—and the bankruptcy court approved—deeming consent based on a failure to opt out. Under the approved solicitation procedures, creditors in "Non-Voting Classes" were sent a "Non-Voting Status Notice" indicating, on the first page, that they were "**_not entitled to vote on the Plan_**," and stating, on the next page, that the plan includes a release and providing instructions about how to opt-out. ROA.202-03. Similarly, creditors entitled to vote on the plan were sent a ballot with a box, on the third page, disclosing the release and warning that if they "do not opt out of the Third-Party Release [they] will be deemed to have granted such releases." ROA.185-87. Neither notice provided an opportunity to opt out of the injunction. For claims "held by the Debtors or affiliates of the Debtors, the Debtors did not provide" a notice. ROA.175.

The vast majority of creditors did not respond to the notices. For example, of the 16,968 opt-out forms sent to non-voting classes, just 165 were returned—less than 1% of the total. ROA.9164. By comparison, 297 forms were returned as undeliverable. ROA.9164.

**2.** At the confirmation hearing, the U.S. Trustee objected to the release as well as the injunction and gatekeeping mechanism. The U.S. Trustee emphasized that in this case, the opt-out mechanism rendered the third-party releases in the plan non-consensual and therefore impermissible under Supreme Court precedent. *See* ROA.9411; *Purdue*, 603 U.S. at 227. The Securities and Exchange Commission (SEC)

8

also objected to the release. ROA.9411; *see* 11 U.S.C. § 1109(a) (generally permitting the SEC to "appear and be heard" in any Chapter 11 case, but not to "appeal from any judgment, order, or decree entered in the case").

The bankruptcy court overruled the U.S. Trustee's objection and approved the plan. The court stated that "if we were writing on a blank slate," the U.S. Trustee's "arguments would be fairly persuasive, but we're not writing on a blank slate." ROA.842. The court observed that bankruptcy courts have previously approved the "use of an opt-out mechanism." ROA.842. It concluded that, because "service was effective" and "because of the opportunity for all the parties to have opted out," the release is "consensual." ROA.843-44. It also approved the injunction and gatekeeping provision, reasoning that "the injunction is the way that you enforce the [release]." ROA.844-45. Although the U.S. Trustee moved to stay the confirmation order, the bankruptcy court denied the motion and the plan was "quickly substantially consummated." ROA.9412.

**3.** After the U.S. Trustee appealed, the district court "largely affirm[ed]" the confirmation order. ROA.9407. As a threshold matter, the court rejected debtors' arguments that the U.S. Trustee lacks standing and that the case is equitably moot. ROA.9413-20.

Turning to the merits, the district court recognized that "the general rule" in contract law is that "silence does not constitute acceptance." ROA.9442. Rather than apply that rule, however, the court fashioned a new, 12-factor federal consent

9

standard applicable only to third-party releases. ROA.9438-40. The court concluded that consent is a matter of federal rather than state law because it determined that the "authority to enter consensual third-party releases derives from federal law," either from the Bankruptcy Code itself or from a federal court's power to enter consent decrees. ROA.9430. In developing a federal consent test, the court did not highlight any Code provision suggesting that it would be appropriate to depart from ordinary contract principles. Instead, the court identified as the "key precedent" justifying its approach a Supreme Court decision rejecting a Fourteenth Amendment Due Process Clause challenge to a state law permitting opt-out consent in certain class actions. ROA.9436 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

Applying its newly created test, the district court determined that the third-party release was consensual as to most of the thousands of affected entities. The court focused on factors that have no bearing on the contract-law understanding of consent, including the bankruptcy court's view that the release was "necessary to the successful reorganization." ROA.9447. The district court also stated, without further explanation, that consent "would likely [exist] even under state law." ROA.9446. It recognized, however, that the release is nonconsensual as applied to "claimants [who] were not allowed to vote because they received nothing under the Plan." ROA.9448. Those claimants, the court explained, "had no incentive to accept the releases to help the reorganization." ROA.9448.

10

Finally, the district court affirmed the injunction but remanded for the bankruptcy court to "narrow[]" the gatekeeping provision. ROA.9454. Like the bankruptcy court, the district court believed that the "injunction merely enforces the releases," and it therefore did not consider the prerequisites for injunctive relief. ROA.9451. The court also concluded that the injunction could be justified on the "alternative" ground that consent for the release amounts to consent for the injunction, even though the notices contained no "separate opt-out boxes" for the injunction. ROA.9453. As to the gatekeeping provision, the court recognized that this Court had recently "narrow[ed] the definition" of the entities that can be protected by such provisions. ROA.9455 (citing *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 359 (5th Cir. 2025)). It accordingly remanded for the "limited" purpose of permitting the bankruptcy court to conform the gatekeeping provision to this Court's precedent. ROA.9459.

## SUMMARY OF ARGUMENT

The plan's third-party release provision is nonconsensual and therefore barred by the Bankruptcy Code. A release is a contract between the releasing and released parties. *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001). Accordingly, the law of contract determines whether a release is consensual. Regardless of whether federal or state contract law applies, the outcome is the same: consent cannot be implied from silence in all but exceptional cases. The disputed release—which treats

the silence of over 16,000 affected claimants as consent to irrevocably terminate their claims against thousands of nondebtors—violates that cardinal rule.

In nonetheless approving the release, the district court disregarded contract principles. Instead, it devised a new, 12-factor federal test for consent applicable only to third-party releases. The court cited as the "key precedent" justifying that approach a Supreme Court decision rejecting a due-process challenge to state class-action rules that expressly treated a failure to opt out as consent. ROA.9436. Nothing in the Court's opinion addressing that constitutional challenge indicates that inferring consent from silence is the norm under federal or any other law.

The district court's application of its new test highlights the degree to which that test departs from longstanding contract principles. The court relied on factors— such as the view that the release was integral to debtors' reorganization plan—that have no bearing on consent under contract law. It made no attempt to fit this case within any of the limited exceptions to the general rule that silence cannot establish consent. And it failed to account for evidence showing that the vast majority of the more than 16,000 claimants who were sent opt-out notices did not respond. It is far more plausible that nonresponding claimants ignored the notices or were confused by the release's convoluted language than that they overwhelmingly intended to release their claims against nondebtors.

Because the district court and bankruptcy court departed from fundamental contract principles, their decisions should be reversed and the case should be

12

remanded for the bankruptcy court to strike the third-party release and the related injunction, or, in the alternative, for the bankruptcy court to apply contract principles. Both federal contract law and state contract law recognize the general rule that silence cannot establish consent. And even if federal law differed from state law, this Court's precedents indicate that state law governs the specific consent question here. Debtors have identified no basis for overriding that law, which reflects the contract-law rule that silence is not consent. Under that rule, the third-party release is nonconsensual. And the injunction barring released claims is invalid for the same reasons and for multiple additional ones, including that neither the district court nor the bankruptcy court considered the prerequisites for injunctive relief.

## STANDARD OF REVIEW

In reviewing "the decision of a district court, sitting in its bankruptcy appellate capacity," this Court applies "a de novo standard of review for conclusions of law" and a "clearly erroneous standard of review for questions of fact." *In re Community Home Fin. Servs. Corp.*, 32 F.4th 472, 481 (5th Cir. 2022).

## ARGUMENT

### I. This Court Has Appellate Jurisdiction

This Court's "jurisdiction over appeals from cases arising in bankruptcy court extends to all 'final judgments, orders and decrees' entered by the district courts." *In re Yazoo Pipeline Co., L.P.*, 746 F.3d 211, 214 (5th Cir. 2014) (quoting 28 U.S.C. § 158(d)). In distinguishing between final and non-final orders, the Court asks

13

whether an order requires a bankruptcy court to conduct "significant further proceedings." *Id.* at 215. When a remand order necessitates "only ministerial proceedings, such as the entry of an order by the bankruptcy court in accordance with the district court's decision, then the order should be considered final." *In re Cortez,* 457 F.3d 448, 453 (5th Cir. 2006).

These principles establish that the district court's order "affirm[ing] in large part" and remanding for a "limited" purpose qualifies as a final, appealable order. ROA.9459. As the district court explained, it remanded for the bankruptcy court to narrow the plan's gatekeeping provision so that it conforms with "the *Barton* doctrine." ROA.9457-58. Under that doctrine, a gatekeeping provision can only protect the "trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity." *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 359 (5th Cir. 2025) (citing *Barton v. Barbour,* 104 U.S. 126 (1881)). Specifically, this Court has construed the *Barton* doctrine as referring to a defined set of individuals and entities: the debtor, the creditors' committee and its members for conduct within the scope of their duties, and trustees within the scope of their duties. *Id.* at 360; *Nexpoint Advisers, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.),* 48 F.4th 419, 437 (5th Cir. 2022). Here, no one was appointed to act as a trustee, nor was there a creditors committee. Accordingly, on remand, the bankruptcy court need only perform the "ministerial" task of amending the gatekeeping provision so that it refers only to the debtor. *Cortez,* 457 F.3d at 453. Because the remand order contemplates no

14

"significant further proceedings," it constitutes a final, appealable order. *Yazoo*, 746 F.3d at 215.

## II. The Disputed Third-Party Release Is Nonconsensual And Thus Unlawful

### A. The Release Deems Silence As Consent In Violation of Foundational Contract-Law Principles

Bankruptcy is the "subject of the relations between a[] . . . debtor and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks omitted). "[B]eneath [the] complexity" of the Bankruptcy Code "lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024). To implement that bargain, the Code grants courts unusual powers to modify relations between debtors and their creditors. These powers are authorized by the Constitution to address a debtor's true financial distress. *Railway Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982); *see* U.S. Const. art. I, § 8, cl. 4.

By contrast, the Bankruptcy Code does not grant courts any express authority to release nondebtors from personal liability to other nondebtors. Except for a narrow provision involving asbestos liability that does not apply here, 11 U.S.C. § 542(g)(4)(A)(ii), the Code does not expressly authorize bankruptcy courts to resolve such claims. And although the Code contemplates that a reorganization plan may "include any other appropriate provision not inconsistent with the applicable

15

provisions of" the Code, *id.* § 1123(b)(6), this catchall paragraph does not mean that

"everything not expressly prohibited is permitted," *Purdue*, 603 U.S. at 218 (quotation

marks omitted).  To the contrary, the catchall paragraph must be interpreted in light

of the "five specific sorts of provisions" that precede it, "all of which concern *the*

*debtor*—its rights and responsibilities, and its relationship with its creditors."  *Id.*

(emphasis in original).  Accordingly, the catchall paragraph "does not authorize a

release and injunction that . . . effectively seeks to discharge claims against a

nondebtor without the consent of affected claimants."  *Id.* at 227.  As the Supreme

Court recently held in *Purdue*, permitting bankruptcy courts to impose such

nonconsensual releases on nondebtor third parties would contravene the Code's text,

structure, and history.  *Id.* at 215-24.

The Supreme Court's analysis was confined to nonconsensual releases and did

not address consensual releases, the authority for which arises from basic contract

principles.  "A release is a species of contract and is governed by principles of

contract law."  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001); *accord*

*Vanderbilt Mortg. & Fin., Inc. v. Flores*, 692 F.3d 358, 364 (5th Cir. 2012) ("Under Texas

law, [a] release is a contract") (quotation marks omitted).  When a bankruptcy court

includes such a release in a reorganization plan, the release has legal force if it

constitutes a binding contract.  *In re Continental Airlines Corp.*, 907 F.2d 1500, 1508-09

(5th Cir. 1990); *cf. Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501,

522 (1986) (holding that consent decrees may contain provisions going beyond what a

16

district court would ordinarily have the power to authorize because the "source of the court's authority to enter any judgment at all" stems from "the parties' agreement," "rather than the force of the law upon which the complaint was originally based"); *Lawyer v. Department of Just.*, 521 U.S. 567, 579 n.6 (similar). "[A] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (quotation marks omitted).

Because a release is a contract, contract law controls the question whether a release is consensual. Restatement (Second) of Contracts § 284 cmt. c (A.L.I. 1981), Westlaw (database updated Oct. 2024) ("The rules of interpretation that apply to contracts generally apply also to . . . releases."). And as the district court here recognized, "the general rule" in contract law, as embodied in the Restatement of Contracts, is that outside of rare exceptions, "silence does not constitute acceptance." ROA.9442; *see* Restatement (Second) of Contracts § 69, cmt. a (stating that, except in "exceptional" circumstances, "an offeror does not have power to cause the silence of the offeree to operate as acceptance"); *accord* 1 Arthur L. Corbin, *Corbin on Contracts* § 3.18 (2025) ("It is certain that, if the only facts are that A makes an offer to B, and B remains silent, there is no contract."); 2 Williston & Lord, *supra* § 6:67 ("As a general rule, an offeree does not need to reply to an offer, and its silence and inaction will not be construed as an assent to an offer."). Indeed, the Restatement specifically provides that "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom

of action or inaction or impose on him any duty to speak." Restatement (Second) of Contracts § 69 cmt. a. This rule is a cornerstone of both federal law and the law of Texas. *See Railroad Mgmt. Co. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005) (recognizing that under Texas law, "[a]s a general rule 'silence and inaction will not be construed as an assent'"); *In re Deepwater Horizon*, 786 F.3d 344, 354 (5th Cir. 2015) ("[F]ederal contract law is largely indistinguishable from general contract principles under state common law").

Under these principles, the third-party release here is nonconsensual. The release and injunction provisions of the reorganization plan irrevocably terminate all manner of claims belonging to over 16,000 nondebtors against an even greater number of other nondebtors. Claimants who do not affirmatively opt out of the release by returning a form to the bankruptcy court are "deemed" to have consented to it. ROA.180. But for purposes of determining whether a contract is consensual, deemed consent—that is, silence—is no consent at all. Accordingly, the disputed release is a nonconsensual third-party release not authorized by the Code.

A hypothetical illustrates the point. Imagine that Doe has a claim against Smith. One day, Smith sends Doe a letter stating that, unless Doe affirmatively opts out by returning a form by some date, Doe shall be deemed to have consented to release the claim against Smith. If Doe does not return the form by the date specified, no court would hold that Doe's silence should be treated as consent to the release. Smith "cannot, merely by saying that [Doe]'s silence will be taken as an acceptance,

18

cause it to be operative as such. The offeror cannot force the offeree to take pen in hand, to use a postage stamp, or to speak, under penalty of being bound by a contract by not expressing a rejection." 1 Corbin, *supra* § 3:19. Yet that is what debtors have purported to accomplish here.

Making matters worse, debtors are not even a relevant contracting party for purposes of the claim being released. The hypothetical contract described above would still be nonconsensual if the letter proposing the opt-out release of Doe's claim against Smith had come not from Smith but from Jones, who neither owns Doe's claim against Smith nor is the person against whom Doe's claim flows. Accordingly, the disputed release—which applies even to claims that do not belong to debtors or flow against debtors but instead belong to over 16,000 nondebtors and flow against other nondebtors—is not consensual either.

### B. The District Court Erred In Applying A Test Unmoored From Contract Principles

The district court acknowledged that as a matter of contract law, "the general rule is that silence does not constitute acceptance." ROA.9442. Rather than apply that rule, however, the court fashioned a 12-factor test for assessing consent specific to the context of third-party releases. That test permits a court to treat a release as consensual when doing so would be impermissible under contract law.

**1.** There is no basis for creating a federal test that deviates from fundamental contract-law principles. The district court did not claim that the Bankruptcy Code

justifies that approach. Instead, the "key precedent" on which the court relied was a Supreme Court opinion involving class actions. ROA.9436 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)). *Shutts* held that the Fourteenth Amendment's Due Process Clause is not offended by a state court exercising personal jurisdiction over out-of-state class members so long as each class member has notice, an opportunity to opt out, and is adequately represented by the named class plaintiffs. 472 U.S. at 811-12. That holding reflects that a legislature can, in some circumstances, define consent to include a failure to opt out without running afoul of "constitutional limitations." *Id.* at 823. Nothing in *Shutts* suggests that the Supreme Court regarded that approach to consent as the norm under federal law or any other law.

Moreover, the Supreme Court's holding in *Shutts* turned on certain "safeguards" specifically adopted in the class-action context. 472 U.S. at 809-10. The district court believed that the Bankruptcy Code similarly includes various "loyalty features" and "structural voice features" protecting entities affected by a third-party release. ROA.9437. That analogy fails. The Code is concerned with ensuring fair treatment of creditors' claims against the debtor and the protections the Code provides are specific to such claims. For example, while the creditors' committee appointed in many Chapter 11 proceedings owes a fiduciary duty to the creditor body as a whole with respect to claims against the debtor, it does not owe any fiduciary duty with respect to claims against non-debtors and it is not required, as a class representative would be, to hold "typical" third-party claims or provide "adequate[]"

20

representation for holders of those claims.  Fed. R. Civ. P. 23(a)(3), (4).  Notably, despite the district court's reliance on creditors' committees for its class-action analogy, ROA.9437, no creditors' committee was ever appointed in this case.

If debtors wish to obtain the benefits of a class action, they must initiate a class action and comply with the rules governing them.  *See* Fed. R. Civ. P. 23(a)-(e), (g); Fed. R. Bankr. P. 7023.  Debtors may not transform a bankruptcy proceeding into a "*de facto* class action[]" by importing features unique to the "particular" context of class actions into a reorganization plan.  *See United States v. Sanchez-Gomez*, 584 U.S. 381, 388-89 (2018); *accord Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) (holding that a "properly conducted class action . . . can come about in federal courts in just one way": using Rule 23" (quotation marks omitted)).  As the Supreme Court recently stressed in *Trump v. CASA, Inc.*, 606 U.S. 831, 849-50 (2025), Rule 23 cannot be sidestepped in this manner.

Apart from its flawed analogy to class actions, the district court did not identify any other legal basis for adopting a new consent test specifically for third-party releases.  For instance, the court never suggested that anything in the Bankruptcy Code's text or structure justifies a departure from ordinary contract principles.  The court discussed at length (ROA.9424-30) its conclusion that the Code grants bankruptcy courts authority to enter consensual third-party releases.  While the provisions on which the court relied only concern the debtor and the claims against it, *see supra* p. 16 (citing *Purdue*, 603 U.S. at 218), the critical point is that regardless of

21

whether the Code provides authority for consensual third-party releases, it does not

define consent or support any departure from the contract-law understanding of that

term.

For similar reasons, the district court erred in invoking (ROA.9424-28) *United States v. Energy Resources Co.*, 495 U.S. 545 (1990). *Purdue* addressed and rejected a similar invocation of that case. As *Purdue* explained, *Energy Resources* simply establishes that § 1123(b)'s catchall paragraph "confer[s] additional authorities on a bankruptcy court." 603 U.S. at 218. *Energy Resources* did not hold that those "additional authorities" extended beyond "*the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* (emphasis in original). Indeed, in *Energy Resources* the Court emphasized bankruptcy courts' "broad authority to modify creditor-debtor relationships." 495 U.S. at 549; *cf. In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 549 (5th Cir. 2002) ("Nothing in *Energy Resources* suggests that bankruptcy courts have jurisdiction to determine the tax liabilities of non-debtors."). And again, because the Bankruptcy Code contains no definition of consent that would apply in this context, the relevant law should be drawn from applicable non-bankruptcy law—here, the generally applicable law of consent as reflected in the Restatement of Contracts.

The district court's discussion of the "analogy" between third-party releases and "consent decrees" only underscores the court's error in declining to apply ordinary contract principles. ROA.9430. This Court has described "[a] bankruptcy plan" as "represent[ing] a kind of consent decree that should be interpreted as a

contract." *In re Texas Commercial Energy*, 607 F.3d 153, 158 (5th Cir. 2010). Thus, any similarities between a bankruptcy plan and a consent decree would provide an additional basis for adhering to contract law. *See Browning v. Navarro*, 743 F.2d 1069, 1076 n.20 (5th Cir. 1984) (noting that a "bankruptcy court[] exceeds its power if it enters a consent decree to which there was not actual consent").

To the extent that the district court suggested that policy considerations counsel against applying ordinary contract principles, it erred. The court stressed, for instance, that third-party releases may be "necessary to the success of a reorganization plan." ROA. 9432, 47. But *Purdue* rejected an identical "policy argument," warning that federal courts "are the wrong audience" for such concerns. 603 U.S. at 225-26. A court's "only proper task is to interpret and apply the law," and as explained above, the disputed release cannot be reconciled with black-letter law governing consent. *Id.*

In any event, *Purdue* illustrates why courts should be skeptical of assertions about what terms are essential for a reorganization to succeed. The proponents of the *Purdue* plan represented that the plan confirmed by the bankruptcy court—in which the Sacklers, who were not debtors in Purdue's bankruptcy, "proposed to return to Purdue's bankruptcy estate $4.325 billion of the $11 billion they had withdrawn from the company in recent years" in exchange for a nonconsensual third-party release terminating essentially all opioid-related claims against them, *id.* at 211—was the "best available" deal by a "very wide margin," Brief of the Debtors-Appellees at 21, *In re Purdue Pharma L.P.*, No. 21-cv-7532 (S.D.N.Y. Nov. 15, 2021), Dkt. No. 151. After

the district court held that the release was unlawful, the plan proponents managed to "reach[] a new agreement" that involved "up to an additional $1.675 billion" in payments from the Sacklers.  Reply in Support of Application for a Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of Certiorari at 27, *Harrington v. Purdue Pharma L.P.*, No. 23A87 (U.S. Aug. 7, 2023), Dkt. No. 10.  And after the Supreme Court held that the Bankruptcy Code does not permit nonconsensual releases, the parties agreed to a consensual third-party release involving an "aggregate payment" of "up to $7 billion."  Disclosure Statement for Thirteenth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors at 7, *In re Purdue Pharma L.P.*, No. 19-23649 (S.D.N.Y. Bankr. June 20, 2025), Dkt. No. 7613.

**2.** Because the district court and bankruptcy court failed to apply contract principles, those courts' decisions approving the third-party release should be reversed and the case remanded for the bankruptcy court to strike the third-party release and related injunction from the plan.  The bankruptcy court inverted ordinary contract principles and appeared to regard silence as generally sufficient to establish consent. *See* ROA.843-44.  And although the district court speculated that the bankruptcy court's consent determination "would likely hold even under state [contract] law," it did not identify any applicable state or federal contract-law exception to the general rule against treating silence as consent.  ROA.9446.

The extent to which the 12-factor test departs from basic contract principles is demonstrated by the district court's application of that test here. For the most part, the court focused on factors unrelated to the consent analysis under contract law. For example, it emphasized that the releases were "integral" to the plan. ROA.9446. Likewise, the court highlighted that some released creditors were "paid in full" and that others were paid in part. ROA.9445, 48; *see* ROA.174-75 (predicting that the estimated recovery for creditors entitled to vote on the plan would be under 20%). Neither the alleged importance of the release nor the plan's treatment of claims against the debtor has any bearing on whether claimants agreed to release claims against non-debtors. As the district court elsewhere acknowledged, the contract-law understanding of consent turns on a party's subjective "intent," not a court's assessment of whether a reasonable person in the party's position would release their claims. ROA.9441.

Similarly incompatible with ordinary contract principles is the district court's reliance on the "absence of creditor objections" to the third-party release. ROA.9447. As contract law makes clear, failing to express opposition is not equivalent to support. *E.g.*, 1 Corbin on Contracts § 3.19 ("[A]n offeror cannot, merely by saying that the offeree's silence will be taken as acceptance, cause it to be operative as such."). In this case, for example, the nonresponding claimants' "silence" could have been "due to a variety of causes." 2 Williston on Contracts § 6:70 (4th ed.). The record shows that although 16,968 notices were sent to non-voting claimants, fewer than 1% of them

returned an opt-out form. ROA.9164. The vast majority of claimants who did not respond may "have made a mental determination to reject the offer" or "have made no determination with respect to the offer whatsoever." 2 Williston on Contracts § 6:70 (4th ed.).

The district court appropriately refrained from invoking any contract law exception to the general rule against inferring consent from silence. It briefly noted that nonresponsive claimants have some "preexisting financial relationship" with the debtor and are thus not "total strangers." ROA.9442. The court did not, however, point to any evidence of a relationship between the thousands of nonresponding claimants and the released nondebtors. Further, for such a relationship to matter under longstanding contract principles, it would need to involve words or conduct indicating that in the future, the claimant intends to "manifest[]" assent "by silence or inaction." Restatement (Second) of Contracts § 69(1)(b) (A.L.I. 1981). Again, the district court identified no evidence that any nonresponding claimant gave any such indication.

Finally, the district court incorrectly attributed to the government the view that "courts should never infer consent from a failure to opt out." ROA.9447. As government counsel made clear during the confirmation hearing, the government's position is not "never opt-out or . . . always opt-out." Bankr. Dkt. No. 201, at 21. Rather, consent to a release turns on ordinary contract principles, which usually but not invariably preclude inferring consent from silence. Because evidence supporting

26

such an inference is absent here, the third-party release should be stricken from the plan.

**3.** The district court devoted much of its opinion to discussing whether "state or federal law" governs here. ROA.9423. But as discussed, any federal law test would be rooted in contract principles. *See supra* pp. 19-24. And "federal contract law is largely indistinguishable from general contract principles under state common law." *Deepwater Horizon*, 786 F.3d at 354. As "there are no differences between the relevant substantive laws," this Court "need not undertake a choice of law analysis." *Railroad Mgmt.*, 428 F.3d at 222.

In any event, even under the district court's incorrect view that federal law authorizes silence to be treated as consent, the debtors still would not prevail because state law, not federal law, would control. "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims. . . ." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (quotation marks omitted). That is because "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000). Under this Court's and other courts' precedent, bankruptcy courts therefore apply state law when determining if a debtor has entered into a valid settlement agreement with a creditor. *See, e.g., Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995); *American Prairie Constr. Co. v. Hoich*, 594 F.3d 1015,

1023 (8th Cir. 2010). That question is not meaningfully different from the question presented here: whether the disputed release, which falls well outside bankruptcy's traditional scope because it purports to be a contract between nondebtors and other nondebtors to release claims that neither belong to nor flow against the debtor, is consensual.

There is no room for dispute that state law normally precludes treating silence as consent to a release. *See* ROA.9442 (stating that this is the "general rule" under state law). No party has suggested that the law of any state other than Texas would control. And Texas law recognizes the "general rule" that "silence and inaction will not be construed as assent." *R.R. Mgmt.*, 428 F.3d at 222 (quotation marks omitted).

The district court invoked a "strong federal interest" in a uniform, bankruptcy-specific rule for "determining whether claimants have consented to a" third-party release. ROA.9435. But this is not one of the "few and restricted" circumstances "in which judicial creation of a special federal rule would be justified." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994). Whether "latent federal power . . . displace[s] state law is primarily a decision for Congress, not the federal courts." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997). And neither the district court, the bankruptcy court, nor the debtors have identified any relevant jurisdiction that treats silence as consent outside the exceptional circumstances identified by the Second Restatement of Contracts. Any concern regarding disuniformity is therefore inapposite. *See Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 190 (1902) (holding that the uniformity principle is not offended

"if the general operation of the law is uniform although it may result in certain particulars differently in different States").

In nonetheless concluding that federal law governs, the district court relied primarily (ROA.9424-29) on its mistaken view that the Bankruptcy Code authorizes it to treat as consensual third-party releases that would not be consensual under contract law. Again, that view is incorrect. *See supra* pp. 19-24. And the Supreme Court has rejected the idea that federal common law supersedes state law whenever a question arises "in the context of a federal bankruptcy." *Rodriguez v. FDIC*, 589 U.S. 132, 137 (2020).

Similar logic forecloses the district court's theory that "a federal court's inherent power to enter consent decrees" provides a "separate basis" for applying federal law. ROA.9430. The bankruptcy court did not purport to exercise its authority to enter a consent decree. Regardless, this Court has recognized that state law governs challenges to the "validity of settlements" in bankruptcy, explaining that "a settlement is a contract and is best resolved by reference to state contracts law." *Omni Video*, 60 F.3d at 232. The same reasoning applies to third-party releases.

It was likewise error for the district court to invoke the need for a "uniform federal rule" governing consent. ROA.9435. Neither the district court, the bankruptcy court, nor the debtors have identified any relevant jurisdiction that treats silence as consent outside the exceptional circumstances identified by the Second Restatement of Contracts.

**4.** The district court magnified these errors by affirming an injunction barring

claims between nondebtors. The court assumed that an injunction follows

automatically whenever a plan contains a release, reasoning that "th[e] injunction

merely enforces the releases." ROA.9451. But "the usual rules for the issuance of an

injunction" apply in bankruptcy. *In re Commonwealth Oil Refin. Co., Inc.*, 805 F.2d 1175,

1188 (5th Cir. 1986) (quoting H.R. Rep. No. 595, at 342 (1977)). Under those rules,

the proponent of an injunction must satisfy multiple additional requirements,

including demonstrating that it faces a "real and immediate" threat absent the

injunction, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983), and showing an

entitlement to relief under the traditional "four-factor" test, *see eBay Inc. v.

MercExchange, LLC*, 547 U.S. 388, 391 (2006). Because the district court and

bankruptcy court disregarded those requirements, the injunction cannot stand.[1]

The district court's belief that the injunction "was also permissible under the

Bankruptcy Court's alternative authority to enter a consent decree" illustrates its

flawed understanding of consent. ROA.9453. The court acknowledged that the

notices contained no "separate" opportunity to opt out from the injunction but

---

[1] For related reasons, the district court also erred in concluding (ROA.9450) that debtors satisfied their burden of establishing that the bankruptcy court had jurisdiction to enter the injunction. Under this Court's "more exacting theory of post-confirmation bankruptcy jurisdiction," a bankruptcy court's jurisdiction only extends to "the interpretation or execution of the debtor's plan." *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 391 (5th Cir. 2001) (citing 11 U.S.C. § 1142(b)). Here, neither the district court nor the debtors have explained why an injunction barring claims between nondebtors would affect the plan's implementation.

treated a failure to opt out from the release as establishing consent to be covered by the injunction.  ROA.9445.  The government is unaware of any precedent supporting the extraordinary view that silence in the face of a form notice demonstrates agreement to be subject to a consent decree enforceable in federal court.  And even putting aside that fundamental problem, there is no basis for treating a failure to opt out from a release as implying assent to the "drastic and extraordinary remedy" of an injunction, which bars released claims on pain of contempt.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).

## CONCLUSION

For the foregoing reasons, the district and bankruptcy courts' decisions should be reversed and this case should be remanded to the bankruptcy court to strike the third-party releases and related injunction from the plan or, in the alternative, remanded to the bankruptcy court for application of contract-law principles.

Respectfully submitted,

*Of Counsel:*

    LISA A. TRACY
      *Deputy General Counsel*
    BETH A. LEVENE
      *Associate General Counsel*
    FREDERICK GASTON HALL
    SUMI K. SAKATA
      *Trial Attorneys*
      *Executive Office for U.S. Trustees*
      *U.S. Department of Justice*

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB

 *s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

July 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,825 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

11 U.S.C. § 1123 ................................................................................................. A1

**11 U.S.C. § 1123**

### § 1123. Contents of plan

**(a)** Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall--

**(1)** designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

**(2)** specify any class of claims or interests that is not impaired under the plan;

**(3)** specify the treatment of any class of claims or interests that is impaired under the plan;

**(4)** provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

**(5)** provide adequate means for the plan's implementation, such as--

**(A)** retention by the debtor of all or any part of the property of the estate;

**(B)** transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

**(C)** merger or consolidation of the debtor with one or more persons;

**(D)** sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

**(E)** satisfaction or modification of any lien;

**(F)** cancellation or modification of any indenture or similar instrument;

**(G)** curing or waiving of any default;

**(H)** extension of a maturity date or a change in an interest rate or other term of outstanding securities;

**(I)** amendment of the debtor's charter; or

**(J)** issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

**(6)** provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities,

and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

**(7)** contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

**(8)** in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

**(b)** Subject to subsection (a) of this section, a plan may--

**(1)** impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

**(2)** subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

**(3)** provide for--

**(A)** the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

**(B)** the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

**(4)** provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

**(5)** modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

**(6)** include any other appropriate provision not inconsistent with the applicable provisions of this title.

**(c)** In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

**(d)** Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.